**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ISSAC NARANJO | _____ : | CIVIL ACTION |
| | : | |
| v. | : | NO. 04-1098 |
| | : | |
| MR. BROOKS, et al. | : | |

**MEMORANDUM AND ORDER**

Kauffman, J.                                                                    March   25   , 2009


        Now before the Court is Defendants' Motion for Summary Judgment (the "Motion").  For

the reasons discussed below, the Motion will be granted.


## I.  BACKGROUND

        This action arises from a prison fight involving Plaintiff Issac Naranjo ("Plaintiff"), two

inmates, and various prison correctional officers.[1]  On April 4, 2002, Plaintiff was housed in the

B-Block at the Philadelphia Detention Center when an inmate named Mackey[2] assaulted him by

throwing a cup of hot water in his face.  Pl.'s Dep. 14, attached to the Mot. at Ex. A.  Plaintiff

alleges that immediately before this attack, he saw Defendant Correctional Officer Brooks

("Brooks") open Mackey's cell door and talk with him briefly.  Id.  Plaintiff claims that Brooks

ordered Mackey to initiate the hot water attack because Plaintiff was complaining about Brooks'

---

        [1]        The facts as presented are based on Plaintiff's Complaint and deposition
testimony.  With the exception of Plaintiff's allegations about his inability to exhaust
administrative remedies, Defendants do not contest the above facts for the purposes of the instant
Motion.

        [2]        In his Complaint, Plaintiff referred to this inmate as "Armstrong."  In his
deposition, he clarified that the correct name is "Mackey."

discriminatory behavior and other misdeeds.  Id. at 9-10.

Angered by the hot water attack, Plaintiff kicked and hit his cell door to alert the guards of the assault.  Id. at 14.  When he received no response, he flooded his prison cell with water from his toilet.  Id. at 17.  Williams, another inmate, was let out of his prison cell to mop up the water.  Id. at 18.  After he was released from his cell, Williams attempted to throw a second cup of hot water in Plaintiff's face.  Id..  When this second attack was unsuccessful, Williams started "attacking [Plaintiff] with a knife through the window" of Plaintiff's cell.  Id.  At that point, Plaintiff's cell door was opened.  Id.

Plaintiff alleges that Mackey and Williams then entered his prison cell and began assaulting him.  Id. at 21.  Mackey attacked him with a knife, and Williams attacked him with a mop.  Id.  Plaintiff was able to disarm Williams and used the mop to defend himself from Mackey's knife attacks.  Id. at 21-22.  During this assault, Plaintiff overheard Brooks telling Williams and Mackey to continue attacking him.  Id. at 23.  The altercation spilled out of Plaintiff's prison cell, and after several minutes, other correctional officers arrived to break up the fight.  Id. at 25.  Once the correctional officers returned Plaintiff to his cell, Brooks entered his cell and kicked him.  Id. at 28.[3]  Plaintiff alleges that Defendant Correctional Officer McCorey ("McCorey"), although not present at the time of the incident, conspired with Brooks by filing a report stating he was present during the fight.  Id. 29-30.[4]

---

[3]      Plaintiff's Complaint alleges that he was on the ground when Brooks kicked him. In his deposition, however, he stated that both he and Brooks were standing upright when Brooks kicked him.  Pl.'s Dep. 28.

[4]      In his deposition, Plaintiff explained that he intended to name Correctional Officer Taylor, Brooks's partner, as a Defendant in this matter, but because Brooks's report stated that McCorey was his partner that day, Plaintiff mistakenly named McCorey as a Defendant.  Pl.'s

After the incident, Plaintiff showed his injuries to Defendant Correctional Sergeant Kindle ("Kindle").  Id. at 30.  Kindle then "laughed and insulted" Plaintiff before taking him to the medical clinic, where he was forced to wait "about an hour" before seeing a doctor.  Id. at 30-31.  The doctor at the medical clinic eventually referred Plaintiff to Temple Hospital where he received seven stitches in his left eye and was treated for facial burns and various stab wounds. Id. at 32.

As a result of the altercation, an internal affairs investigation took place, and Plaintiff answered questions posed to him by the investigator.  Id. at 34-35.  In his deposition testimony for the instant action, Plaintiff claimed that he did not file an inmate grievance about the incident because he "didn't know any procedures or anything about grievances" and because "the guards didn't allow [him] any pen or paper" and "sent various prisoners to intimidate [him]."  Id. at 35.

Plaintiff's pro se Complaint was filed pursuant to 42 U.S.C. § 1983 and seeks injunctive relief as well as damages.[5]  On March 14, 2008, Defendants filed the instant Motion, arguing that they are entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies prior to filing suit.

---

Dep. 29.  Nevertheless, Plaintiff believes McCorey is a proper Defendant because he falsely stated he was present during the fight to help cover up the wrongdoing.  Id. at 29-30.

[5]    The original Complaint listed Brooks, McCorey, and Kindle as Defendants.  On May 18, 2005, Plaintiff filed a motion for leave to amend the Complaint and add the City of Philadelphia as an additional Defendant.  On June 16, 2005, the Court denied Plaintiff's motion for leave to amend because any claims against the City of Philadelphia were barred by the statute of limitations.

## II.  LEGAL STANDARD

In deciding a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, the test is "whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law."  Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999) (quoting Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994)). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must examine the evidence in the light most favorable to the non-moving party and resolve all reasonable inferences in that party's favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "there can be 'no genuine issue as to any material fact' . . . [where the non-moving party's] complete failure of proof concerning an essential element of [its] case necessarily renders all other facts immaterial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The party moving for summary judgment bears the initial burden of showing the basis for its motion.  See Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001).  If the movant meets that burden, the onus then "shifts to the non-moving party to set forth specific facts showing the existence of [a genuine issue of material fact] for trial."  Id.  Because Plaintiff is appearing pro se, the Court will construe his filings liberally and hold them "to less stringent standards than formal pleadings drafted by lawyers."  Haines v. Kerner, 404 U.S. 519, 520 (1972).

-4-

## III.  ANALYSIS

The Prison Litigation Reform Act of 1995 ("PLRA") requires a prisoner bringing a prison conditions lawsuit under 42 U.S.C. § 1983, or any other federal law, to exhaust "such administrative remedies as are available" prior to filing suit.  42 U.S.C. § 1997e(a).  The Supreme Court has explained the purpose of the exhaustion requirement as follows:

> Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.  In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation.  In other instances, the internal review might filter out some frivolous claims.  And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy.

Porter v. Nussle, 534 U.S. 516, 524-25 (2002) (internal quotation marks and citations omitted).  The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Id. at 532 (citing Wilson v. Seiter, 501 U.S. 294, 299 n.1 (1991)).  A prisoner must exhaust all administrative remedies before filing suit in federal court even if the administrative process does not provide the relief he might achieve from a successful federal suit.  See, e.g., Woodford v. Ngo, 548 U.S. 81, 85 (2006) (explaining that under the PLRA, a prisoner must "exhaust administrative remedies even where the relief sought—monetary damages—cannot be granted by the administrative process" (citing Booth v. Churner, 532 U.S. 731, 734 (2001))); Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000) ("[W]e hold that the PLRA amended § 1997e(a) in such a way as to make exhaustion of all administrative remedies mandatory—whether or not they provide the inmate-plaintiff with the relief he says he desires in

his federal action.").

In support of the Motion, Defendants state that "[e]very inmate, upon admission to [the Philadelphia Prison System ("PPS")], is provided a copy of the inmate handbook, which explains PPS rules and procedures."  Decl. of Gregory Vrato, Esq. ("Vrato Decl.") ¶ 4, attached to the Mot. at Ex. D.  The inmate handbook specifically outlines the grievance procedure, explaining what issues may be the subject of a grievance and describing how to file a grievance.  See PPS Inmate Handbook 38-39, attached to Vrato Decl. at Ex. 2.  Included among the issues for which a grievance may be filed are "an alleged violation of civil, constitutional, or statutory rights"; "an alleged criminal or prohibited act by a staff member, contract employee, volunteer, or other inmate(s)"; and "medical diagnosis or treatment, including quality of treatment."  Id.  Moreover, policies and procedures relating to inmate grievances are posted in "all inmate housing areas, social services offices, and prison libraries," and the phrase "all inmate housing areas" includes the B-Block where Plaintiff was incarcerated.  Vrato Decl. ¶ 5.

Defendants state that according to the PPS grievance database, "Plaintiff did not file a grievance regarding the alleged assault by another inmate that occurred on April 4, 2002."  Id. ¶ 9; PPS Lock & Track Report, attached to Vrato Decl. at Ex. 3.  Accordingly, they argue that they are entitled to summary judgment for failure to exhaust available administrative remedies.

**A.  Plaintiff Did Not Exhaust His Administrative Remedies**

In response to the Motion, Plaintiff for the first time asserts the claim that he did, in fact, file a grievance.[6]  The exhibit he attaches in support of this assertion, however, shows only that

_____

[6]  Throughout his deposition, for example, Plaintiff acknowledged that he never filed an administrative grievance about the incident.  See Pl.'s Dep. 35 ("Q: You didn't file a grievance about this incident, did you?  A: No.  I didn't register a grievance.").

he submitted a written grievance to an internal affairs investigator, not that he filed a grievance in accordance with the PPS guidelines.  See Internal Affairs Investigation Report, attached to Pl.'s Resp at Ex. J.  As numerous courts have recognized, participation in an internal investigation is not the equivalent of exhausting a prisoner's administrative remedies.  See, e.g., Panaro v. City of N. Las Vegas, 432 F.3d 949, 954 (9th Cir. 2005) ("Panaro was required to present a grievance to the officials responsible for maintaining the detention center before he could bring his action against the defendants.  We hold that Panaro's participation in the internal investigation of Officer Hollins' conduct cannot be considered to be equivalent to Panaro's assertion of a grievance in the administrative procedure available at the detention center."); Freeman v. Francis, 196 F.3d 641, 644 (6th Cir. 1999) ("[T]he exhaustion requirement in § 1997e(a) is directed at exhausting the prisoner's administrative remedies in the corrections system, and investigation by another agency does not satisfy the requirement of the statute.").

    Although Plaintiff argues that the grievance he handed to the investigator was an attempt to satisfy the exhaustion requirement, he neither filed the grievance properly nor exhausted his remaining administrative remedies by pursuing the grievance through all levels of review.[7]  In Drain v. McLeod, 2007 U.S. Dist. LEXIS 4236, at *17 (E.D. Pa. Jan. 19, 2007), the district court explained that a PPS prisoner who completed a "use of force" report during an internal affairs investigation did not satisfy the exhaustion requirement because, even if the act of completing the

_____

    [7]    As explained in the inmate grievance procedures posted throughout the prison, a prisoner has ten days from the date of an incident in which to file a grievance.  A grievance is considered first by a deputy warden and then by the facility warden, who approves, modifies, or denies the deputy warden's recommended resolution.  If an inmate is dissatisfied with the warden's decision, he or she has five days in which to appeal to the Commissioner of PPS.  See PPP Number 3.F.10, attached to Vrato Decl. at Ex. 1.

report could be considered initiation of the grievance process, "the plaintiff neither followed up with the Warden, nor did he file an appeal with the Commissioner."  The same holds true in this case: even if the Court were to accept Plaintiff's argument that he intended to initiate the grievance process by misfiling his grievance with an internal affairs investigator, the Court would be unable to excuse his failure to exhaust his claim through the required procedures.  See Woodford, 548 U.S. at 84 (explaining that the PLRA requires "proper exhaustion" of administrative remedies).  Plaintiff never attempted to follow up with prison officials or appeal his grievance, and this failure is fatal to his argument that he exhausted his administrative remedies.  See, e.g., Jernigan v. Stuchell, 304 F.3d 1030, 1032 (10th Cir. 2002) ("An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under PLRA for failure to exhaust his administrative remedies." (citing Wright v. Hollingsworth, 260 F.3d 357, 358 (5th Cir. 2001))).[8]

### B.  The Administrative Remedies Were Available to Him

Plaintiff also contends that the administrative grievance procedures were not made available to him for a variety of reasons.  See 42 U.S.C. § 1997e(a) (explaining that a prisoner may not file a prison conditions suit under federal law "until such administrative remedies as are available are exhausted" (emphasis added)).  First, he contends that he speaks only Spanish and that he was unaware of the proper grievance procedures.  As discussed above, the grievance

---

[8]     While the Third Circuit has recognized that "compliance with the administrative remedy scheme will be satisfactory if it is substantial," Nyhuis, 204 F.3d at 77-78, misfiling a grievance without ever following up or inquiring as to its status cannot be considered "substantial" compliance.  See, e.g., Rodriguez v. Smith, 2006 U.S. Dist. LEXIS 10726, at *34-35 (E.D. Pa. Mar. 16, 2006) (finding that a prisoner failed to comply substantially with the administrative remedy scheme where he wrote and spoke to the prison warden but never "attempted to make a second or third-step appeal within the . . . prison system").

policies and procedures were posted in all inmate housing areas, and the record reflects that such

postings were made in English <u>and</u> in Spanish.  <u>See</u> Vrato Decl. ¶ 5; PPP Number 3.F.10

(providing inmate procedures and polices in English and in Spanish); PPS Inmate Handbook 39

("A complete set of the inmate grievance procedures will be posted, and forms will be available

in all housing areas, social service offices, and prison law libraries.  The procedure and forms

will be available in English and Spanish.").  While Plaintiff asserts that he never received a copy

of the inmate handbook and stated in his deposition testimony that he "didn't know any

procedures or anything about grievances," Pl.'s Dep. 35, he has submitted no evidence to

challenge the fact that the procedures were posted in Spanish throughout the prison.  That

Plaintiff chose to ignore the grievance policies and procedures posted in his native language does

not mean the administrative remedies were not "available" to him.

Second, relying on <u>Mitchell v. Horn</u>, 318 F.3d 523, 529 (3d Cir. 2003), Plaintiff contends

that prison guards deprived him of access to necessary grievance forms and writing material.  He

also claims that correctional officers threatened him in an effort to protect Defendants.  In

support of these contentions, he cites an affidavit he produced in response to the Motion in which

he states that various correctional officers "didn't allow [him] any pen or paper, they refused

[him] writing materials and threatened [him] to get even if [he tried] to complain about C/O

Brooks, C/O Taylor, and Kindle."  Pl.'s Aff. 1 ¶ 2, attached to Pl.'s Resp at Ex. E.[9]  The

affidavit, however, fails to explain how the correctional officers were able to ensure that he could

_____

[9]       Plaintiff attached a series of affidavits to his response at Exhibit E.  All affidavits
are dated April 21, 2008 and describe the incident, its immediate aftermath, or other problems
Plaintiff has encountered in prison.  To distinguish among the affidavits, the Court will identify
them sequentially ("Aff. 1," "Aff. 2," etc.) in the order in which they were attached to his
response.

not obtain pen or paper at any time of day or night.  He fails to provide a single fact as to when

he requested a pen or paper, who received the request, when the request was denied, or what was

said by the correctional officer who denied the request.  At his deposition, Plaintiff could not

name even a single officer who denied him grievance forms.  See Pl.'s Dep. 36 ("Q: Do you

remember who you asked for forms on Block A?  A: I remember the person.  It was a young

woman.  There was another officer, but I don't remember her name.").[10]  Likewise, Plaintiff's

vague assertion that correctional officers were working together and making unspecified threats

against him is insufficient to support his contention that no administrative remedies were made

available.[11]  In short, "Plaintiff has not provided . . . any specific allegations of acts of harassment

or retaliation related to his ability to exhaust his administrative remedies."  Troutman v. Ozmint,

2007 U.S. Dist. LEXIS 67224, at *17-18 (D.S.C. Sept. 11, 2007).  Accordingly, the Court

concludes that Plaintiff's unsupported and conclusory statement that he was prevented from

exhausting his remedies is insufficient to avoid summary judgment for failure to exhaust

administrative remedies.  See id. at *15-18 (explaining that the plaintiff's vague, unsupported

---

[10]     One of Plaintiff's affidavits asserts that Correctional Officers Jacobs, Huzzy, Herder, and other unnamed officers were "friends" with Defendants and were "working together" with them.  Pl.'s Aff. 1 ¶ 2.  While the affidavit identifies at least some members of the conspiracy Plaintiff describes, no single fact in any evidence Plaintiff has submitted supports the conclusory assertion that all parties he identifies were actively conspiring to conceal Defendants' wrongdoing.

[11]     The only evidence Plaintiff submits to support this assertion is an incident report describing a May 3, 2002 fight between himself and another inmate.  See "Two Inmates Fighting Top Tier on A-Blk," attached to Pl.'s Resp. at Ex. Q.  Although Plaintiff asserts that various correctional officers ordered the inmate to attack him, the incident report fails to support this assertion.  The report merely describes how the fight was broken up by correctional officers and describes the injuries Plaintiff and the other inmate sustained.  Given that this incident occurred long after the deadline for filing a grievance expired, the incident report does not support his contention that officers employed other prisoners to ensure that Plaintiff did not file a grievance.

allegation "that corrections officials have engaged in retaliation, harassment, and 'covering up'" was insufficient "to raise an issue of material fact as to whether prison officials prevented him from exhausting his administrative remedies"); see also McCabe v. Ernst & Young, LLP, 494 F.3d 418, 436 (3d Cir. 2007) (explaining that "a party must present more than just 'bare assertions, conclusory allegations or suspicions'" to defeat a properly supported motion for summary judgment (quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005))).

Third, Plaintiff contends that when unidentified persons "brought him back to the institution from the Temple Hospital, they placed him in [a] cell locked in the infirmary." Pl.'s Resp. 10. Upon arrival in the infirmary, "the psychiatrist [tried] to force [Plaintiff] to take medication [for] thirteen days." Id. Because Plaintiff had only ten days to file a grievance, he claims he was prevented from doing so by the "mental health staff," who forced him to take unidentified medications and, in some unexplained manner, denied him access to the grievance procedures. Id.[12] The record evidence, however, fails to establish the vast conspiracy Plaintiff alleges. The warden's report of the incident states that "[Plaintiff] sustained an eye injury and he was sent to Temple Hospital for evaluation of the eye. [He] will be evaluated by the mental health staff upon his return to the institution." Apr. 11, 2002 Warden's Report, attached to Pl.'s Resp. at Ex. S. However, nothing in the record supports the assertion that this evaluation by the mental health staff lasted thirteen days and included forced medication and complete denial of access to the grievance process.[13] Accordingly, the Court declines to credit the unsupported

---

[12]     Plaintiff's numerous affidavits do not discuss these contentions. Rather, his allegations about the mental health staff appear only in his response to the Motion.

[13]     Plaintiff has submitted a Medication Sheet Administrative Record that reflects treatment he received beginning on April 5, 2002, including various medications, sutures, and

allegations Plaintiff makes with respect to this claim.  See, e.g., Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006) ("[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.").

Fourth, Plaintiff claims that a correctional officer told him that he did not have to file a grievance "because the matter was being investigated."  Pl.'s Resp. 9.  This argument relies on the decision in Brown v. Croak, 312 F.3d 109, 113 (3d Cir. 2002), in which the Third Circuit explained that when prison officials inform a prisoner to wait to file a grievance until completion of an investigation and never inform the prisoner when the investigation is completed, the grievance procedure is not "available" under the PLRA.  Even if the Court were to credit the assertion that an officer told him not to file a grievance, however, Plaintiff's alleged reliance on the officer's statement does not aid him because it allegedly occurred on or after May 13, 2002, long after the time to file a grievance had expired.  See Pl.'s Aff. 3 ¶ 1 (explaining that on May 13, 2002, the correctional officer brought Plaintiff to see the internal affairs investigator and later, through an inmate who was bilingual, told him he did not have to file a grievance).  Accordingly, Plaintiff's argument does not establish that he was misled about filing a grievance during the time period in which he was able to pursue his administrative remedies.

---

antibacterial ointment.  See Medication Sheet Administrative Record, attached to Pl.'s Resp. at Ex. R.  However, this exhibit fails to support his argument that any medication was forced upon him, nor does it describe any other events that support Plaintiff's claims about denial of access to the grievance process for thirteen days.

## IV.  CONCLUSION

For the reasons discussed above, the Court finds that Plaintiff failed to exhaust all available administrative remedies prior to filing suit.  Because the PLRA requires complete exhaustion, the Court will grant Defendants' Motion.  An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ISSAC NARANJO | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 04-1098 |
| | : | |
| MR. BROOKS, et al. | : | |

## ORDER

    **AND NOW**, this    25th    day of March, 2009, upon consideration of Defendants'
Motion for Summary Judgment (docket no. 46) and Plaintiff's Response thereto (docket no. 50),
and for the reasons stated in the accompanying memorandum, it is **ORDERED** that the Motion
is **GRANTED**.  Accordingly, judgment is entered in favor of Defendants, and the Clerk of the
Court shall mark this case **CLOSED**.

                                         **BY THE COURT:**


                                  **S/ BRUCE W. KAUFFMAN**
                                  **BRUCE W. KAUFFMAN,  J.**